## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BARRY STEER, individually and as the representative of a class of similarly situated persons, and on behalf of The Charles Stark Draper Laboratory, Inc. Retirement Plan for Draper Employees and the Charles Stark Draper Laboratory, Inc. Supplemental Retirement Annuity Plan,<br><br>        Plaintiff,<br><br>V.<br><br>THE CHARLES STARK DRAPER LABORATORY, INC.; THE RETIREMENT PLAN OVERSIGHT GROUP; and JOHN and JANE DOES 1-10,<br><br>        Defendants. | Civil Action No.:<br><br><br>COMPLAINT<br><br><br>CLASS ACTION |

## NATURE OF THE ACTION

Plaintiff Barry Steer, PhD ("Plaintiff") brings this class action lawsuit on behalf of his retirement plan, himself, and other similarly situated individuals. Defendants The Charles Stark Draper Laboratory, Inc., ("Draper"), The Retirement Plan Oversight Group ("RPOG") and John and Jane Does 1-10 (collectively, "Defendants"), are fiduciaries of the retirement plans of which Plaintiff and class members have been participants, the Charles Stark Draper, Inc. Retirement Plan for Draper Employees ("the Retirement Plan") and the Charles Stark Draper, Inc. Supplemental Retirement Annuity Plan ("the SRAP"). As described herein, Defendants have breached their fiduciary duties to the Plans in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), to the detriment of the Plans, their participants, and their beneficiaries. As outlined below, Defendants have failed to monitor the Plans' investments and fees prudently. They have failed to ensure that the thousands of participants in the Plans have had appropriate investment options—resulting in millions from participants' accounts tied up in funds identified as imprudent in past cases—and to ensure the fees they pay for plan services are reasonable—during the class period, participants paid as much as $98 for services materially

identical to those for which participants in similar plans paid half as much or less. Plaintiff brings this action to remedy this unlawful conduct, recover losses to the Plans and participants, and obtain other appropriate relief as provided by ERISA.

## PRELIMINARY STATEMENT

1.      This is a class action complaint against Draper and all other Defendants to challenge their repeated failure to administer the Plans prudently, their causing the Plans to enter into prohibited transactions, and their improper monitoring of fiduciaries and service providers to the Plans. Plaintiff sues pursuant to ERISA Sections 409 and 502, 29 U.S.C. §§ 1109 and 1132 and alleges as follows.

2.      ERISA imposes a range of strict fiduciary duties in order to safeguard plan participants like Plaintiff. Fiduciaries—like the Defendants—are subject to strict duties of loyalty and prudence. They must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A) and with the "care, skill, prudence, and diligence" expected in managing a plan of similar scope. *Id.* § 1104(a)(1)(B). These fiduciary duties are among "the highest known to the law." *Sellers v. Trustees of Boston Coll.*, 647 F. Supp. 3d 14, 23 (D. Mass. 2022) (quoting *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 204 (D. Mass. 2020)).

3.      In addition, ERISA "supplements the fiduciary's general duty of loyalty to the plan's beneficiaries by categorically barring certain transactions deemed 'likely to injure the pension plan.'" *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 25 (1st Cir. 2018); (quoting *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241-42 (2000)); *see also Harris Tr. & Sav. Bank*, 530 U.S. at 241 (discussing ERISA Section 406(a)(1), 29 U.S.C. § 1106(a)(1)). ERISA's Section 406(a)(1) provides in part that "[a] fiduciary with respect to a plan shall not . . . cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C).

4.      Ensuring that ERISA fiduciaries prudently and loyally manage defined contribution ("DC") plans in particular is increasingly important. As of the end of 2023,

Americans had approximately $10.6 trillion in such plans—403(b) plans, like each of the Plans, more common 401(k) plans, and similar vehicles.[1] While defined benefit ("DB") plans, or traditional pensions, were the predominant retirement vehicle for previous generations, less than a quarter of Generation X, Millennials, and Generation Z retirees are expected to receive any traditional pension income.[2] By contrast, two-thirds of workplaces with retirement plans offer DC plans.[3]

5.      At the same time, imprudent and disloyal mismanagement often harms DC plan participants much more than those in DB plans. Employers sponsoring DB plans must stand behind the promised benefit amount and are therefore ultimately responsible for remedying fiduciaries' breaches before participants experience harm: "In a defined-benefit plan, retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020). Employers therefore have strong incentives to reduce fees and eliminate underperforming investments. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). In DC plans by contrast, employers do not guarantee any level of benefits, and participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015); *see also Hughes v. Northwestern Univ.,* 595

---

[1] *See* The Brightscope/ICI Defined Contribution Plan Profile: A Close Look at ERISA 403(b) Plans, 2020, at 4 (Apr. 2024), *available at* https://www.ici.org/system/files/2024-04/24-ppr-dcplan-profile-403b.pdf. 403(b) plans, like the Plans, and 401(k) plans operate largely the same in practice and the legal framework applicable to 403(b) plan fiduciaries is materially identical. *See generally*, *e.g., Sweda v. Univ. of Pa.*, 923 F.3d 320 (3d Cir. 2019).

[2] *See* Report on Secure Retirement Institute FactBook, *available at* https://401kspecialistmag.com/11-eyebrow-raising-facts-from-the-secure-retirement-institute-chapter-1/. When Congress enacted ERISA, there were more than twice as many DB participants as DC participants. Today, there are almost seven times as many DC participants. Cong. Research Serv., *A Visual Depiction of the Shift from Defined Benefit (DB) to Defined Contribution (DC) Pension Plans in the Private Sector* (Dec. 27, 2021), *available at* https://crsreports.congress.gov/product/pdf/IF/IF12007.

[3] Cong. Research Serv., *supra* n.2 at 1.

U.S. 170, 174 (2022) ("Each participant chooses how to invest her funds, subject to an important limitation: She may choose only from the menu of options selected by the plan administrators . . ."); 29 U.S.C. § 1002(34). Because employers and other fiduciaries bear no risk, they lack the same incentive to police costs and investment performance.

6.      The Department of Labor has emphasized that investment options' fees and underperformance can have a pronounced effect on workers' ability to secure their future. For example, a difference of 1% in annual fees can dramatically impact retirement. A worker paying 1.5% instead of 0.5% in fees and earning 7% on an initial $25,000 balance can expect her assets will be nearly *30% lower* after 35 years, adding up to $100,000 less to retire on.[4] That worker can expect a lower quality of life in retirement or may be forced to work extra years to make up for the lost opportunity. Such an outcome only worsens if she also earns less in performance.

7.      Market participants have studied 403(b) plans and concluded that overpayment and waste are rampant in the field, costing participants billions per year. Aon Hewitt Retirement & Investment, in a 2016 report, echoed the DOL's conclusion that small differences in fees can result in tens of thousands less for a worker at retirement.[5] The report urged fiduciaries to take action, noting that "403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness" by, among other things, "[l]everaging aggregate plan size and scale to negotiate competitive pricing."[6]

8.      Despite the high stakes their decisions have on participants' chance for a secure requirement, despite being subject to ERISA's strict fiduciary duties, and despite the serious

---

[4] U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

[5] Aon Hewitt Retirement & Investment, How 403(b) Plans are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It (Jan. 2016), *available at* https://www.aon.com/attachments/human-capital-consulting/how-403b-plans-are-wasting-nearly-10billion-annually-whitepaper.pdf.

[6] *Id.* at 1.

potential for harm to Plaintiff and other participants, Defendants failed to employ a prudent process for managing the Plans.

9.      Draper sponsors retirement plans for its employees, including the Retirement Plan and the SRAP.

10.     Defendants' mismanagement of the Plans has cost participants millions of dollars. As detailed below, Defendants limited the Plans' participants to low-performing and/or high-cost investment options by failing to act within a reasonable time to address the imprudent TIAA Real Estate Account and failing to act at all as to the CREF Stock Account, the second largest investment in the combined Plans, or the American Funds EuroPacific Growth Fund. These three funds alone contain over a fifth of participants' assets. Defendants also subjected participants to high recordkeeping costs during the class period, well higher than similar plans' participants pay for recordkeeping services that are materially indistinguishable. Similar issues have been flagged as imprudent in prior ERISA litigation of which Defendants could and should have been aware, including litigation involving the exact same TIAA funds. *See Sellers*, 647 F. Supp. 3d at 30-31. Moreover, employees of Draper's close peer institution, the Massachusetts Institute of Technology, challenged similar breaches of prudence in a high-profile case that generated opinions denying defendants' dismissal and summary judgment motions. *See Tracey v. Mass. Inst. of Tech.*, 404 F. Supp. 3d 356 (D. Mass. 2019). Finally, Defendants' failure to ensure that TIAA earned only reasonable compensation from its multi-faceted relationship with the Plans violated ERISA's prohibited transaction provisions.

11.     Courts have frequently concluded that such conduct is sufficient to state a claim for breach of fiduciary duty and engaging in prohibited transactions. *See, e.g.*, *id.* at 362, 363*; see also Brookins v. Northeastern Univ.*, --- F. Supp. 3d ----, 2024 WL 1659507, at *6 (D. Mass. Apr. 17, 2024) (denying motion to dismiss claims involving TIAA recordkeeping services and proprietary funds); *Daggett v. Waters Corp.*, --- F. Supp. 3d ----, 2024 WL 1677421, at *10 (D. Mass. Apr. 18, 2024); *Velazquez v. Mass. Fin. Servs. Co.*, 320 F. Supp. 3d. 252, 259 (D. Mass. 2018) (plaintiff sufficiently pled claim for fiduciary breach by "plausibly alleg[ing] that the

higher fees were unjustified or otherwise improper"); *Baker v. John Hancock Life Ins. Co. (U.S.A.)*, No. 1:20-CV-10397-GAO, 2020 WL 8575183, at *1 (D. Mass. July 23, 2020) ("[T]he long-term retention of a substantial number of underperforming funds at higher than comparable costs gives rise to a plausible inference of an objectively imprudent monitoring process."); *Bugielski v. AT&T Servs., Inc.*, 76 F.4th 894, 912 (9th Cir. 2023) (reversing grant of summary judgment for defendants and concluding that ERISA's prohibited transaction provisions require a fiduciary to consider all compensation that a party-in-interest such as a recordkeeper receives).

12.     At all times during the Class Period, the Plans together had at least $1.1 billion in assets under management. At the end of 2020, 2021, and 2022 their combined assets were approximately $1.46 billion, $1.61 billion, and $1.403 billion. For 2023, the combined Plans reported over $1.607 billion in assets available for benefits. That year, the Retirement Plan had 4,124 participants with account balances at year-end, while the SRAP had 2,338 such participants at the end of 2023.[7] These assets all were, and continue to be, entrusted to the care of the Plans' fiduciaries, including Defendants.

13.     Even standing alone, the Retirement Plan's assets under management, at $1.192 billion in 2023, ranks it among the top 0.7% of all 403(b) plans. Plans this large have outsized bargaining power in the marketplace for DC plan services and greater control over the fees and expenses charged against participants' investments. *See Pinnell v. Teva Pharms. USA, Inc.*, No. CV 19-5738, 2020 WL 1531870, at *5 (E.D. Pa. Mar. 31, 2020). The Plans' participant counts likewise place them in the highest percentiles of all 403(b) plans, and their combined count only increases their market power.[8] Defendants, however, did not prudently use this power to ensure participants had access to the best investment options and reduce the Plans' expenses.

---

[7] *See* December 31, 2023 Form 5500 for the Retirement Plan, filed with the DOL at 2, 41 and December 31, 2023 Form 5500 for the SRAP at 2, 30. The 2023 Forms 5500 were filed October 11 and are the most recent available.

[8] Brightscope/ICI, *supra* n.1, at 7 (stating that, out of 17,980 403(b) plans on record with the DOL in 2020, only 127 had over $1 billion in assets). The Retirement Plan has had over 3,000 participants for each year of the class period—only 721 fell in this category, while 241

14.     Based on this and other conduct detailed below, Plaintiff asserts claims against Defendants for breaching their fiduciary duty of prudence (Count One) and engaging in prohibited transactions (Count Two). Plaintiff also asserts a claim against Defendant Draper for its failure to monitor other fiduciaries appointed to manage the Plans, including the RPOG (Count Three).

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), because it is an action brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.* Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which authorize employee retirement plan participants to bring civil actions on behalf of their Plans to remedy fiduciary breaches, prohibited transactions, and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132.

16.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District. This Court also has personal jurisdiction over Defendants because ERISA provides for nationwide service of process.

17.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the ERISA violations occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391, because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

---

plans had over 5,000. *See id.* at 10. The ICI is a leading trade association for the mutual fund industry. *See id*. at 62.

## PARTIES

### Plaintiff

18.     Plaintiff Barry Steer, PhD resides in Oceanside, California. During and after his employment with Draper, Plaintiff participated in the Retirement Plan, investing in the options offered under the Plan, experiencing reduced choice because the underperforming options offered under the Plan limited his options, and paying the excessive recordkeeping fees that are the subject of this lawsuit. Plaintiff Steer has been financially injured by the unlawful conduct described herein. Plaintiff Steer's account would be worth more today had Defendants not violated ERISA as described herein.

19.     Plaintiff has standing to bring this action on behalf of the Retirement Plan because he participated in the Plan and was injured by Defendants' unlawful conduct. Plaintiff also has standing to bring suit on behalf of the Retirement Plan pursuant to ERISA Section 502(a)(2). 29 U.S.C. § 1132(a)(2); *see also* 29 U.S.C. § 1109. Plaintiff has standing to sue on behalf of a class of participants in both the Retirement Plan and the SRAP as he has established his own constitutional injury caused by Defendants. *See Chavez v. Plan Benefit Servs., Inc.*, 108 F.4th 297, 312-14 (5th Cir. 2024); *id.* at 308-09 (citing *In re Asacol Antitrust Litig.*, 907 F.3d 42, 49 (1st Cir. 2018)). Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account and what his account is or would have been worth, but for Defendants' breaches of fiduciary duty as described herein. Had Defendants not breached their duty, Plaintiff would have paid lower recordkeeping fees and the value of his account would correspondingly be higher. Plaintiff also has authority to recover on behalf of the Plans for injuries caused to the Plans by imprudent recordkeeping fees, imprudent monitoring of the Plans' investment options, and entry into prohibited transactions.

20.     Plaintiff lacked knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and otherwise engaged in conduct violating ERISA until shortly before he filed suit. These material facts consisted of information such as the investment alternatives that Defendants could have made available within the Plans, the costs

and investment performance of existing options compared to potential alternatives that Defendants could have made available, the plan costs he experienced and the costs similarly sized plans paid for recordkeeping services of similar quality, as well as information for costs and performance of different types of available investments.

**Defendants**

21.     Defendant Draper is a government contractor and research firm headquartered in Middlesex County, Massachusetts. Draper's principal place of business is 555 Technology Square, MS 44, Cambridge, MA  02130-3563. *See* Summary Plan Description—Retirement Plan for Draper Employees (formerly the Retirement Plan for Staff Members of the Charles Stark Draper Laboratory, Inc.) ("SPD") at 23.

22.     Draper is the "plan sponsor" of each of the Plans within the meaning of 29 U.S.C. § 1002(16)(B). *See id.*[9] Draper is also a "named fiduciary" pursuant to 29 U.S.C. § 1102(a) because it has the ultimate authority to control and manage the operation and administration of the Plans. Moreover, because Draper exercises discretionary authority or control with respect to management and administration of the Plans and disposition of the Plans' assets, Draper is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

23.     The Board of Directors is Draper's governing body. *See* 2022 Form 990, Charles Stark Draper Laboratory, Inc., Sched. O).

24.     The Retirement Plan Oversight Group ("RPOG") serves as the Plan Administrator for the Retirement Plan. SPD at 1, 23.

25.     A single Investment Policy Statement, applicable to both Plans, provides that "[t]he RPOG is tasked with the responsibility for overseeing the investment of the assets of the Plans as a fiduciary under ERISA. The members of the RPOG are appointed by the Chief Executive Officer ("CEO") who has the authority to appoint and replace RPOG members as deemed appropriate." The Charles Stark Draper Laboratory, Inc. Retirement Plan for Draper

---

[9] *See also* Retirement Plan Form 5500, *supra* n.7 at 1, 44 (Auditor's Report, Note A); SRAP Form 5500, *supra* n.7 at 1, 33 (Auditor's Report, Note A).

Employees and Supplemental Retirement Annuity Plan Investment Policy Statement (March 2024) at 3.

26.     Draper, as Plan Sponsor and Named Fiduciary, has the power to appoint other fiduciaries of the Plans. As outlined in the Investment Policy Statement, Draper's CEO has authority to appoint and replace RPOG members "as deemed appropriate." Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

27.     Draper, acting through its Board of Directors and other leadership, had a fiduciary duty to monitor and supervise any appointed plan fiduciaries, including members of the RPOG, through Draper's CEO. As set forth in detail below, all fiduciaries responsible for the Plans' administration have failed to carry out their duties prudently.

28.     For the foregoing reasons, at all times during the Class Period, Draper was a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority over management or disposition of plan assets and exercised discretionary authority to appoint and/or monitor the other fiduciaries, which in turn had control over plan management and/or authority or control over management or disposition of the Plans' assets. While Plaintiff has not named Draper's CEO, individual Directors, or other Draper leadership as Defendants, Plaintiff reserves the right to do so based on information obtained through discovery.

**John Doe Defendants**

29.     To the extent that there are additional officers, employees, board members, administrators, and/or contractors of Draper who are/were fiduciaries of the Plans during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 1-10 include, but are not limited to, Draper officers, employees, board members, administrators, and/or contractors who are/were fiduciaries

of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), through service on the RPOG or otherwise, during the Class Period.

**THE PLANS AND THEIR ADMINISTRATION**

30.     The Plans are defined contribution or individual account plans that include a cash or deferred arrangement. Each is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), covering eligible current and former Draper employees, including Plaintiff. Both Plans are qualified plan under 26 U.S.C. § 403, commonly referred to as "403(b) plans." Retirement Plan Form 5500 at 44 (Auditor's Report, Note A); SRAP Form 5500 at 33 (Auditor's Report, Note A).

31.     The Retirement Plan was previously known as the Retirement Plan for Staff Members and was established July 1, 1976. SPD at 2.

32.     In the Retirement Plan, a participant's account consists of the sum of her or his contributions and the employer's matching contributions, while in the SRAP, their account consists solely of participant contributions. *Id.* at 3; Retirement Plan Form 5500 at 44 (Auditor's Report, Note A); SRAP Form 5500 at 33 (Auditor's Report, Note A).

33.     Retirement benefits provided by the Plans are based solely on these amounts contributed to participants' accounts, and any income or gains (or losses) on such contributions, less any expense that may be allocated to such participants' accounts. *See* Retirement Plan Form 5500 at 44 (Auditor's Report, Note A); SRAP Form 5500 at 33 (Auditor's Report, Note A).

34.     Teachers Insurance Annuity Association ("TIAA") and associated entities are the Plan Custodians for each Plan. *See* Retirement Plan Form 5500 at 55 (Auditor's Report, Note F); SRAP Form 5500 at 40 (Auditor's Report, Note F).

**Eligibility**

35.     An employee is eligible to participate in the Retirement Plan immediately upon hiring and makes contributions through salary deferrals. SPD at 3; *see also id.* (listing groups excluded from eligibility, such as workers designated as "student/employee" workers).

**Contributions and Vesting**

36.     Once an eligible employee enrolls in the Retirement Plan, Draper reduces their pay by the amount the employee specifies, subject to IRS limits. *Id.* at 3-4. Draper makes corresponding contributions, subject to provisions for employees who transferred from the Massachusetts Institute of Technology immediately prior to July 2, 1976 or employees who become disabled. *Id.*[10] SRAP participants may contribute 100% of their compensation, subject to IRS limitations. SRAP Form 5500 at 33 (Auditor's Report, Note A).

37.     According to the Retirement Plan's 2023 Forms 5500, employer contributions totaled $27,132,775. Retirement Plan Form 5500 at 43. Like other employers, Draper enjoys significant benefits from sponsoring the Plans, including benefiting from increased employee recruitment and reduced turnover.

**The Plans' Investments**

38.     The Plans allow participants to invest in several mutual funds, including target date funds (funds that in turn invest in a mix of equity and fixed income investments ostensibly balanced based on the investor's time until retirement).

39.     Overall, the Plans include approximately 35 options, of which 12 are TIAA target date funds or "Lifecycle Funds." Retirement Plan Form 5500 at 57; SRAP Form 5500 at 42. For the Retirement Plan, the largest single investment is the TIAA Traditional Annuity, followed by the CREF Stock Account.[11] Retirement Plan Form 5500 at 56. The CREF Stock Account is the third largest in the SRAP. SRAP Form 5500 at 41; *see also supra* ¶¶ 87 *et seq.*

---

[10] Prior to 2009, the Retirement Plan included defined benefit features, including for certain participants who were transferred into the Plan on July 2, 1976 from MIT. Retirement Plan Form 5500 at 44 (Auditor's Note A).

[11] Effective January 1, 2024, the Retirement Plan was amended to allow participants to use a self-directed brokerage option, under which they may invest their retirement funds in a broader range of options in the marketplace. *See generally* ERISA Advisory Council on Employee Welfare and Pension Benefit Plans, *Report to the Honorable Marty Walsh, US Sec'y of Labor, Understanding Brokerage Windows in Self-Directed Retirement Plans* (Dec. 2021), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/about-us/erisa-advisory-council/2021-understanding-brokerage-windows-in-self-directed-retirement-plans.pdf; Sixth Amendment to Retirement Plan for Draper Employees, Signed Jan. 2, 2024.

40.    The Plans' Investment Policy Statement lists criteria for selecting investment options, including "[t]he investment option's performance, risk, and fees, relative to its benchmark or other investment funds in the same category," and lists options for the RPOG to take action for problematic options, including removing or freezing the option. While the Investment Policy Statement states that it is "not being adopted as an instrument governing the Plans," Plaintiff currently lacks information to ascertain whether it functioned in practice as a plan document and had force beyond collecting hortatory language.

41.    As alleged below, Defendants failed to prudently manage the Plans' investment options.

**Payment of Plan Expenses**

42.    During the Class Period, certain administrative and investment expenses paid using Plan assets were reported on each of the Plan's Forms 5500.

**ERISA Fiduciary Duties**

43.    ERISA imposes strict fiduciary duties, including duties of loyalty and prudence, upon retirement plan fiduciaries like Defendants here. ERISA Section 404, 29 U.S.C. § 1104(a)(1) provides: "[A] fiduciary shall discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . . and (D) in accordance with the documents and instruments governing the plan." *See also Hughes*, 595 U.S. at 172.

44.    "[T]he twin duties of loyalty and prudence,' . . . are among 'the highest known to the law.'" *Glass Dimensions, Inc. v. State Street Bank & Trust Co.*, 931 F. Supp. 2d 296, 304-05 (D. Mass. 2013); *see also Sellers,* 647 F. Supp. 3d at 14; *Sweda*, 923 F.3d at 333.

-13-

45.     ERISA's "prudent person" standard serves "to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 418 (2014) (quotation omitted). Recently, the Supreme Court emphasized that this standard imposes a "continuing duty of some kind to monitor investments and remove imprudent ones." *Hughes*, 595 U.S. at 175 (quoting *Tibble*, 575 U.S. at 530). Fiduciaries must exercise prudence in selecting investments and are also subject to a "continuing duty to monitor [plan] investments and remove imprudent ones," which exists "separate and apart" from the duty with respect to the initial selection. *Tibble*, 575 U.S. at 529. They must dispose of any imprudent investments within a reasonable time and may be held liable either for "assembling an imprudent menu of investment options" or "failing to monitor the plan's investment options to ensure that each option remains prudent." *Bendaoud v. Hodgson*, 578 F. Supp. 2d 257, 271 (D. Mass. 2008) (citing *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

46.     A fiduciary must ensure that *each* investment option is and remains prudent, and cannot justify a breach of its duty by arguing that it has offered some prudent investments along with imprudent investments. *Hughes*, 595 U.S. at 176.  "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds" available within the plan could have "theoretically . . . create[d] a prudent portfolio." *Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283, 289 (D. Mass. 2008), *aff'd*, 555 F.3d 1 (1st Cir. 2009) (quoting *DiFelice*, 497 F.3d at 423).

47.     ERISA also requires Plan fiduciaries to act in accordance with Plan documents. Any violation of the terms of plan documents constitutes a fiduciary breach. *Dardaganis v. Grace Capital, Inc.*, 664 F. Supp. 105, 108 (S.D.N.Y. 1987), *aff'd* 889 F.2d 1237 (2d Cir. 1989); *see also Vander Luitgaren v. Sun Life Assur. Co. of Canada*, 765 F. 3d 59, 64 (1st Cir. 2014) ("[A] fiduciary 'must act in accordance with the documents and instruments governing the plan insofar as they accord with the statute.'") (quoting *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 101 (2013)).

**ERISA Prohibited Transactions**

48.     In addition to imposing strict fiduciary duties, ERISA supplements the fiduciary duty of loyalty by prohibiting fiduciaries from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest." ERISA Section 406(a)(1)(C); 29 U.S.C. § 1106(a)(1)(C).

49.     TIAA, as the Plans' recordkeeper, is a party interest by virtue of its providing services to both plans. *See* 29 U.S.C. § 1002(14)(B); *see also* Retirement Plan Form 5500 at 56 (Auditor's Report, Note G), 57; SRAP Form 5500 at 41 (Auditor's Report, Note G), 42; *Bugielski*, 76 F.4th at 901.

50.     Fiduciaries like Defendants cannot, consistent with Section 406(a)(1)(C), allow plans to contract for services, like recordkeeping and the provision of investments, from service providers like TIAA unless the transactions satisfy an exemption contained elsewhere in ERISA or an exemption that the Department of Labor has promulgated.

51.     Courts addressing service contracts with recordkeepers have held that ERISA's prohibited transaction provisions and statutory exemptions require "a fiduciary [to] consider all compensation—direct and indirect—that the party in interest receives 'in connection with' the services it provides the plan under the contract." *Bugielski*, 76 F.4th at 911 (quoting Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. 5632, 5650, 2012 WL 313892 (Feb. 3, 2012)). Failure to consider *all* compensation that a service provider, such as TIAA, takes in and to ensure that such compensation is reasonable, constitutes a prohibited transaction and violates ERISA.

<strong>DEFENDANTS' ERISA VIOLATIONS</strong>

52.     As described above, Defendants were each fiduciaries of both Plans.

53.     Plaintiff lacked and continues to lack actual knowledge of Defendants' specific decision-making process for managing the Plans, including their process for selecting and

monitoring service providers or Plan investments, as this information is in the sole possession of Defendants.

54.    Plaintiff has drawn reasonable inferences regarding these processes from the facts set forth herein for purposes of this Complaint.

A.    **Defendants Caused Participants to Incur Unreasonable Recordkeeping Fees During the Class Period.**

55.    TIAA and its associated entities provide the Plans a set of administrative services, such as tracking participants' account balances and sending participant communications, that collectively are described as "recordkeeping." *See generally Hughes*, 595 U.S. at 174. The services TIAA provides to the Plans' participants are materially identical to that of other recordkeepers on the market. As confirmed through documents received in response to an information request to the Plan Administrator and other plan disclosures, the services provided are entirely consistent with those provided by other recordkeepers.[12] (That is, the materials do not demonstrate that the Plans' populations present special challenges for recordkeepers or that TIAA provides services that differ materially from those provided by TIAA's competitors.) Several services (such as processing Qualified Domestic Relations Orders, *see* 29 U.S.C. § 1056 (d)(3)(B)(i)) may even be a profit center for recordkeepers. Recordkeepers will compete to win contracts with DC plans, particularly those with many assets and/or large participant populations, like the Plans.

56.    Indeed, the recordkeeping marketplace is so commoditized and competitive that TIAA itself has long experienced declining revenue from its recordkeeping practices. A joint investigation by the Securities and Exchange Commission and New York's Attorney General brought to light disturbing information about a TIAA subsidiary's marketing practices stretching

---

[12] Plaintiff submitted the request in spring 2024, pursuant to ERISA Section 104(b)(4) and other authority, to obtain information about the Retirement Plan, its recordkeeping arrangements, and its investments. *See* 29 U.S.C. § 1024(b)(4). Defendants provided documents tailored to that Plan, but several contained information relevant to the SRAP Plan, such as the charter for Defendant RPOG.

back to 2012. As the investigation noted, the practices grew out of TIAA's realization a decade

ago, that its business line of administering employer-sponsored plans (like the Plans) was in

trouble, in part due to demographic trends and in part due to the highly competitive nature of the

retirement plan marketplace. *In re Investigation by Letitia James of TIAA-CREF Individual &*

*Institutional Services, LLC*, Assurance of Discontinuance at 2-3, 21-035 (July 13, 2021).

57.    That subsidiary had a years-long record of taking advantage of TIAA's privileged

access to retirement plan participants to, essentially, scare them into buying services they didn't

need. The NYAG's findings lay out the practice:

> "Beginning in or about 2012, TIAA Services and its salespeople used a false and
> misleading marketing pitch to convince investors to roll over assets from low-fee
> employer-sponsored retirement plans to individual managed accounts in TIAA Services'
> Portfolio Advisor program, on which TIAA Services charged lucrative management
> fees."
>
> *Id.* at 1.

58.    TIAA's subsidiary trained and incentivized salespeople "to identify clients' 'pain

points.'" (*i.e.,* their concerns about their retirement readiness) and sell them managed services,

which earned the company more money. *Id.* at 2, 4. TIAA's subsidiary leveraged two key assets

enjoyed by its parent—access to retirement plan participants and "the trust of its clients." *Id.* at 3.

59.    TIAA is itself the subject of a lawsuit alleging that it knowingly participated in

breaches by plans' fiduciaries (such as Defendants here) who should have been (and who ERISA

mandated to have been) monitoring TIAA's activities and putting a stop to such conduct. *See*

*Carfora v. Tchrs. Ins. Annuity Ass'n of Am.*, No. 21 CIV. 8384 (KPF), 2024 WL 2815980, at *9

(S.D.N.Y. May 31, 2024).

60.    More troublingly, media reports from as recently as August indicate that TIAA

has only continued its conduct. One report noted that "TIAA is generating losses on one of its

core, legacy businesses — recordkeeping for the retirement plans at the colleges and other

nonprofits it serves." The report continued with an account, drawn from a whistleblower suit, of

an internal TIAA presentation last fall at which TIAA's director of finance told employees that the company could offset these losses by selling its own in-house products (that is, funds like the CREF Stock Account or the TIAA Real Estate Account, the latter of which is specifically cited in the article). The report quotes this TIAA official as saying "If they [clients] have Vanguard, we're not earning any money on the product and we're losing money on the recordkeeping, . . . Where we make that up is on the product side, [with] TIAA proprietary products."[13]

61.    The main drivers determining the fees plans pay are the participant count for the plan involved, whether (unlike here) the recordkeeper provided an unusual level of specialized, non-core services, and whether the recordkeeper could anticipate earning ancillary revenue (revenue earned as a result of access to participants, such as revenue from participants rolling over to an IRA or purchasing expensive services from the recordkeeper), as attested to by an expert offering an opinion in a case filed in this District that also involved two parallel plans.[14] In addition, recordkeepers considering the levels of fees to charge plans look to factors such as the amount of assets in the plans and, as TIAA's director of finance noted, the ability to place the recordkeeper's own investments on plans' platforms.

62.    Plan fiduciaries can arrange for recordkeeping to be paid directly by the plan sponsor or from the plan's assets (i.e., from participant accounts). Here, recordkeeping expenses were paid from the Plans' assets, meaning they were paid from participant accounts.

---

[13] Gretchen Morgenson, *To Cover Losses Elsewhere, TIAA Pushes Costly in-house Products on Retirement Savers, Whistleblower Says*, NBC News (Aug. 2, 2024), *available at* https://www.nbcnews.com/investigations/tiaa-pushes-costly-retirement-products-cover-losses-whistleblower-rcna161198. Other recordkeepers have responded to "today's increasingly competitive retirement recordkeeping market" by consolidating, which in turn further drives down costs. *See* Tim Hoying, *The Changing Retirement Recordkeeping Landscape in the US*, Accenture Capital Markets Blog (May 9, 2023), https://capitalmarketsblog.accenture.com/changing-retirement-recordkeeping-landscape-us.

[14] In the report, which involved recordkeeping services provided by TIAA and one of its competitors, an expert with decades of experience in the recordkeeping industry listed these factors and confirmed that the market is competitive, which has led to declining fees. *See* Expert Report and Rebuttal Report of Ty Minnich, *Sellers v. Trustees of Boston College*, No. 22-cv-10912-WGY (D. Mass.) (D.E. 68-1; 68-6).

63.     In some cases, investment funds will pay some portion of money collected from participants as "expense ratios" – calculated as a percentage of a participant's assets in an investment fund – to recordkeepers to help cover recordkeeping expenses, which is known as "revenue sharing." The recordkeeper, in turn, might pay all or a portion of those revenue sharing proceeds back to a plan, which can use the those proceeds for plan expenses or to credit participant accounts.

64.     While courts have recognized that fiduciaries' use of revenue sharing is not per se imprudent, they have noted that revenue sharing may hide the true scope of fees from participants and even from fiduciaries themselves. *See, e.g.*, *Tussey v. ABB, Inc.*, 746 F. 3d 327, 336-37 (8th Cir. 2014).

65.     Here, the Plans engaged in revenue sharing, leading to underreporting of the compensation figures on the Plans' Forms 5500 and lack of clarity to participants. Both Plans' Forms 5500 throughout the Class Period reported direct compensation that translates to less than fifty cents per participant, with amounts ranging from $9 to $7,253 for the Retirement Plan and $0 to $3,403 for the SRAP, all obvious understatements. This practice apparently ended with this year's Forms 5500, filed after receiving Plaintiff's information request, when the reported amounts jumped to $242,508 and $55,814. The Forms all reported that TIAA received indirect compensation (potentially revenue sharing from non-TIAA investments or fees from TIAA options), but the actual amounts of that indirect compensation are not disclosed.

66.     In reality, participants were charged recordkeeping fees that exceeded the fees paid for similar services by similar-sized plans throughout the class period. For example, the Retirement Plan's 2022 fee disclosure to participants, produced in connection with the information request, *supra* n.12, stated that participants were required to pay $98 per year as a "Plan Servicing Fee." Even if participants received credits through revenue sharing, the value of those credits was reduced by the amount they paid for the Plan Servicing Fee.

67.     In addition to revenues from Plan Servicing Fees, TIAA also received substantial revenue through participant investments in its proprietary funds, in the form of expense ratios.

The fee disclosure lists expense ratios attributable to the Retirement Plan's investments. Multiplying these figures by the assets in each investment as of the end of 2023, yielded a total of approximately $2.653 million, or over $600 per participant. The bulk of these funds went to TIAA in one form or another—approximately 24 of the options in both Plans were from TIAA, and over three quarters of participants' assets were invested in them—but it is unclear how much, since the Forms 5500 and other available materials do not disclose how much the 10 non-TIAA options paid in revenue sharing.

68.     Applying this same analysis to the SRAP's investments, and assuming the expenses for each investment options were the same, yields a total of approximately $993,000 or over $425 per participant. Again, TIAA would not recover this entire amount, and the amount is attributable to factors other than recordkeeping (such as the costs associated with TIAA's investments), but as TIAA's conduct shows, and as it emphasizes to its own employees, it treats revenue from proprietary funds as essentially a fungible substitute for recordkeeping revenue. *See supra* ¶ 60.[15]

69.     Plans with comparable participant counts and/or asset amounts paid dramatically less, providing evidence that Defendants' process for monitoring the Plans' recordkeeping fees was imprudent.

70.     Additional sources show that the Plans' recordkeeping fees were unreasonably excessive. NEPC, a consulting group, recently published the results of a survey of defined contribution plans, reporting on factors such as the fees plans paid. *See* NEPC, LLC, *NEPC 2023*

---

[15] Each Plan's Form 5500 indicates that the TIAA contract included a Revenue Credit arrangement, through which TIAA returns some funds to the relevant Plan. However, neither the Forms 5500 nor the documents produced in response to the information request, *see supra* n.12, indicate the relationship between this Credit and the fee disclosure data (e.g., whether this amount ultimately reduces the $98 per participant fee). But even subtracting the Credit results in excessive fees, without even accounting for ancillary revenue—subtracting the Credit amounts from the totals in paragraphs 67 and 68 results in per-participant totals of "only" $159.24 and $172.66. Discovery is ultimately needed to establish the actual amount TIAA received.

*DC Plan Trends & Fee Survey* (March 2024).[16] The group sampled 240 DC plans, with 2.6 million participants and $259 billion in aggregate assets. The median plan had $626.8 million in assets and 4,729 participants, a participant count similar to the Retirement Plan's with a smaller asset total. *See id.* at 4; *see also supra* ¶ 12.

71.    NEPC's survey confirmed the principle that larger plans are able to obtain lower recordkeeping fees and showed lower fees across a range of plan sizes. The results found that per-participant fees decreased as plan sizes increased and that half of surveyed plans with between 1,000 and 5,000 participants paid between approximately $45 and approximately $70 per participant. NEPC 2023 Report at 14; *see also id.* (listing corresponding amounts of approximately $37 to approximately $45 for plans with between 5,000 and 15,000 participants). Given the correlation between size and fees noted in Mr. Minnich's expert opinion, *see supra* n.14, and confirmed in the survey itself, it is highly likely that the smaller plans accounted for the bulk of the higher-fee survey responses in this category and that larger plans within the range paid less.

72.    Additional evidence filed in similar cases before different sessions of the District of Massachusetts provides a reasonable inference that even lower figures are appropriate for determining the reasonable fees available to the Plan.

73.    In *Sellers*, which also involved two DC plans, there with a combined participant population of approximately 6,900, Mr. Minnich provided his opinion that a reasonable recordkeeping fee would have been $31 for the years 2018 to the present, citing evidence from comparable plans with a range of participant counts showing that fees even above $50 in prior years were rare. *See* Report, *supra* n.14, at 22; *see also id.* at 17-20 (discussing fees charged to participants in five other plans, several larger than the plans at issue in that case, ranging from $29.51 to $54 per participant for years beginning in 2010). The $31 per-participant figure found support in objective market data, in the form of two separate bids submitted in response to a

---

[16] *Available at* https://www.nepc.com/wp-content/uploads/2024/03/2023-NEPC-DC-Plan-Trends-Fees-Report-Press-Release_Final.pdf.

Request for Proposal ("RFP") in 2018 to provide recordkeeping services for a *combined* plan. Each of the two $31 bids was from an established recordkeeper. The plans in *Sellers* did not accept the bids, however, and despite this decision and other aspects of the process employed by the fiduciaries in that case, each plan—one of which used TIAA—separately paid a lower fee than Defendants here caused the Plan to pay. Plan II in *Sellers*, with approximately 3,300 participants at the end of 2022, paid between $47 and $92 on a per-participant basis from 2017 on, paying above $70 only the first two years of that period and experiencing a decline after the RFP. *See* Report, *supra* n.14 at 23.

74.    In *Brown v. The MITRE Corporation*, the Court denied a motion to dismiss claims regarding recordkeeping fees, noting that the plaintiffs there identified plans including one with only 3,146 participants, that paid between $23 to $35 per participant in recordkeeping fees to varying recordkeepers between 2013 and 2019. No. 22-CV-10976-DJC, 2023 WL 2383772, at *2 (D. Mass. Mar. 6, 2023) (citing Complaint) (emphasis added); *see also* Complaint, *Brown v. The MITRE Corp.*, ¶ 87 (listing plans with fewer than 7,000 participants, that paid $32.74 or less in per-participant fees).

75.    While some, but not all, plans discussed in the preceding paragraphs had more participants than either of the Plans, all of the data enforces the conclusion that recordkeeping fees are related to size and that fees have declined over time given the competitive nature of the marketplace. Further, while each of the Plans might be expected to have slightly higher recordkeeping fees than one with more participants, such as some of the plans cited in *Brown*, participants here paid fees many times higher than would be expected.

76.    As a final example, data from Forms 5500 filed with the DOL in 2022 shows that plans with almost identical participant counts as the Retirement Plan paid as low as $14.51 per participant, and this comparison does not even account for the additional bargaining power that the SRAP presented, which Defendants should have leveraged. This analysis assumes those filers accurately reported TIAA's compensation unlike Defendants here, *see supra* ¶ 65 and it highlights how much of an outlier both of the Plans are in terms of recordkeeping fees. For

example, a plan sponsored by Nestle USA, with three more active participants than the Retirement Plan, paid $17.76 to Voya Institutional Plan Services; the Ohio Living 403(b) plan, with 2 fewer participants, paid the next highest amount, $66.76 to VALIC Retirement Services, despite having one-sixteenth the assets of the Retirement Plan.[17] Each had almost the exact same number of participants as the Retirement Plan, and each had fiduciaries who apparently were more successful at leveraging their bargaining power without even considering the effect of the SRAP's 2,225 participants:

| Plan Sponsor | Active Participants (2022) | Assets | Provider | Fees | Per-Participant fees |
|---|---|---|---|---|---|
| Signature Aviation | 4,156 | $217,221,393 | Fidelity | $203,336 | $48.93 |
| Nestle USA | 4,154 | $289,139,659 | Voya | $73,762 | $17.76 |
| *Draper* | *4,151* | *$1,045,827,916* | *TIAA* | *$406,798* | *$98* |
| Ohio Living | 4,149 | $63,965,270 | VALIC | $276,975 | $66.76 |
| Sandvik, Inc. | 4,141 | $539,841,237 | T. Rowe Price | $60,094 | $14.51 |

77.     Viewed differently, out of 1,581 Forms 5500 that reported compensation to a TIAA entity, fewer than 10% showed higher compensation paid to TIAA than the $98-per-participant figure (and none more than the higher figures derived from the investments' expense ratios). Of those, precisely 3 had more than 2000 active participants—plans sponsored by Bard College (2,356), Sacred Heart University (2,192), and National Public Radio (2,024). None had as many participants as even the Retirement Plan's 4,151, let alone both Plans combined.

---

[17] Source: Schedule C data from Department of Labor Forms 5500 filings. The assets listed for the Retirement Plan include the assets attributable to the Plan's Defined Benefit component; those assets are also invested with TIAA.

78.    Indeed, even taking at face value the TIAA compensation figure reported on the Retirement Plan's most recent Form 5500, *see supra* ¶ 65, and ignoring any indirect and ancillary compensation, the $242,508 figure translates to an excessive $58.80 per participant.

79.    To satisfy their duty of prudence, fiduciaries must evaluate all fees participants pay to a recordkeeper or other service provider on a continuing basis. *See* Dep't of Labor, *A Look at 401(k) Plan Fees*, *supra* n.4, at 2; *see also Bugielski*, 76 F.4th at 912 ("[T]he duty of prudence requires a fiduciary to discharge his or her duties "solely in the interest of [plan] participants and beneficiaries" and for the purpose of "defraying reasonable expenses of administering" the plan. *A fiduciary cannot do so, however, if he or she is unaware of how and to what extent a service provider is compensated.*") (citation omitted) (emphasis added). This requires an evaluation of every fee a service provider receives, whether through direct compensation, revenue sharing, expense ratios, or other revenue, and a prudent fiduciary should ensure any payments exceeding reasonable compensation are returned to the Plan. Here, both Plans' Forms 5500 report that TIAA received indirect revenue as well, without providing details. Retirement Plan Form 5500 at 21; SRAP Form 5500 at 10.

80.    Apart from indirect revenue from items such as revenue sharing, recordkeepers also earn ancillary revenue as a result of their relationships with plans. Report, *supra* n.14, at 15-16. This can come in the form of revenue from participants rolling over funds to Individual Retirement Accounts, *see id.*, or participants purchasing services such as investment advice or investment management and selecting proprietary funds from the recordkeeper's affiliates—that is, the very type of lucrative services toward which TIAA has pushed participants as recently as last year. *See supra* ¶ 60.

81.    Some plans have barred recordkeepers entirely from earning ancillary revenue of this kind. *See, e.g., Vellali v. Yale Univ.*, No. 3:16-CV-1345(AWT), 2022 WL 13684612, at *12-13 (D. Conn. Oct. 21, 2022) (noting that plan acted to limit similar practices by TIAA in 2016).

82.    The information available to Plaintiff contains no indication that Defendants made themselves aware of the possibility of ancillary revenue. To the contrary, the fact that Defendants

appear to have taken no action to replace TIAA despite extensive documentation of TIAA's aggressive efforts to earn ancillary revenue across the marketplace indicates that Defendants did not require TIAA to reduce its fees or otherwise monitor TIAA to account for any such revenue.

83.    Even leaving aside TIAA's notoriety, prudent fiduciaries not only ensure they are aware of the compensation service providers receive but also look externally, to the marketplace, to determine what comparable plans are paying their service providers. This information, consequently, helps determine what is reasonable compensation. Courts have held that this may require conducting a Request for Proposal process, issuing RFPs every three to five years as a matter of course or more often if benchmarking or other information shows the fees are unreasonable. *See Brookins,* 2024 WL 1659507, at *3; *Sellers,* 647 F. Supp. 3d at 26 (collecting cases); *Brown*, 2023 WL 2383772, at *6; *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *see also Tracey v. Mass. Inst. of Tech.,* No. CV 16-11620-NMG, 2017 WL 4478239, at *3 (D. Mass. Oct. 4, 2017) ("As part of the 'prudent man standard' one would expect a fiduciary to obtain bids at some point[.]") Obtaining market information is particularly important since fees in the retirement plan marketplace regularly show a downward trend. *See* Brightscope/ICI, *supra* n.1 at 39; Report, *supra* n.8 at 6-8.

84.    Both ERISA and DOL regulations "require[] plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries." DOL 408(b)(2) Regulation Fact Sheet[18] at 1. In guidance to fiduciaries, the DOL has emphasized that staying informed about the marketplace is a key component of prudent conduct:

> "Responsible plan fiduciaries also must ensure that arrangements with their service
> providers are 'reasonable' and that only 'reasonable' compensation is paid for services.
> Fundamental to the ability of fiduciaries to discharge these obligations is obtaining

---

[18] *Available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/factsheets/final-regulation-service-provider-disclosures-under-408b2.pdf.

information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers."

*Id.* (emphasis added).

85.     The facts available to Plaintiff—including that the Plans have retained the same recordkeeper over the course of the Class Period and before, as far back as 2009, and that the fees paid are excessive—support an inference that Defendants failed to conduct RFPs at reasonable periods and otherwise failed adequately to explore whether the Plans could obtain more favorable rates in the recordkeeping marketplace, which is highly competitive and includes many firms capable of offering the same levels of service, as TIAA's own conduct shows. *See supra* ¶ 60.

86.     In light of the Plans' asset sizes and participant counts, the trend toward lower recordkeeping expenses and the competitive nature of the marketplace, and evidence that comparable plans paid much less for the same services, the Plans could have obtained recordkeeping services of the same or better quality at a lower cost.

**B.     Defendants Failed To Act Meaningfully to Monitor Investments, Limiting Participants to Imprudent Investment Options.**

87.     Defendants also failed to prudently select and monitor the Plans' investment options during the Class Period. Defendants' inaction exposed the Plans' participants to underperforming and excessively costly investments, wasting the Plans' assets and harming each participant's ability to obtain a secure retirement through prudent investment options.

88.     Defendants should have been aware of the flaws in some of the Plans' most popular investments based on the options' performance and cost data, but their failure to act within a reasonable time supports an inference that Defendants' acted imprudently. Several of the options have been flagged in prior litigation, including within the First Circuit. The issues identified in those cases have persisted into the Class Period and to the present day.

89.     In comparison to options in similarly sized plans, some of the Plans' investments were more expensive and returned less than comparable options.

90.     Each fund in the Plan has an associated expense ratio, reflecting the fee charged for investment management and other services. The expense ratio is based on a percentage of assets and is determined in the sole discretion of an investment option's managers. An expense ratio of 0.5% means a participant will pay $5.00 annually for every $1000 in assets invested in that fund. *See generally Brookins*, 2024 WL 1659507, at *1. The expense will then reduce the participant's return and the compounding effect of that return, as outlined in the DOL's "A Look at 401(k) Fees" guidance. *Supra* n.4. This effect increases the importance of having prudent fiduciaries monitoring investment fees and net performance.

91.     As noted above, Defendants are responsible for monitoring the various investment options made available to participants in each Plan. The Plans' Forms 5500 list the options. As of December 31, 2023, each Plan offered largely the same, approximately 35 investment options; the Retirement Plan alone offered the TIAA Traditional Non-Benefit Responsive Insurance contract (one version of the TIAA Traditional Annuity). The options with the most significant participant assets invested, excluding target date funds, were:

| Option Name | Combined Plans' Assets |
| --- | --- |
| TIAA Traditional Non-Benefit Responsive Insurance contract[19] | $280,924,438 |
| CREF Stock Fund Variable annuity contract | $238,133,491 |
| Vanguard Institutional Index Fund Institutional Plus Shares | $147,627,596 |
| TIAA Traditional Benefit Responsive Insurance contract | $89,467,004 |
| T. Rowe Price Inst'l Large Cap Growth Fund | $61,584,279 |
| American Funds EuroPacific Growth Fund | $54,871,874 |
| Vanguard Explorer Fund | $52,036,733 |
| CREF Growth Fund | $48,303,142 |

---

[19] The entire amount of assets is from the Retirement Plan, as this option does not appear on the SRAP. For the TIAA Traditional Benefit Responsive Insurance contract, the bulk of assets are in the SRAP.

| TIAA Real Estate Fund Pooled separate account | $43,914,573[20] |
|---|---|

92.     A participant who enrolls in a plan but does not specify an investment allocation will have contributions invested in the plan's "qualified default investment alternative" ("QDIA"), selected by the plan's fiduciaries operating under DOL guidelines. The Retirement Plan's applicable QDIA is one of the TIAA age-based, Lifecycle Funds. *See* SPD at 5.

**1. Defendants Have Failed to Act Within a Reasonable Time to Address Underperforming Options.**

93.     Both of the Plans have included investment options whose performance failed to justify their expense.

94.     The CREF Stock Account, the option with the most participant assets in the combined Plans behind the TIAA Traditional Annuity, has long underperformed, and several plans' participants have successfully challenged its inclusion in their own plans. These include cases within the First Circuit. In 2019, the Third Circuit held a complaint plausibly alleged that the fiduciaries of the University of Pennsylvania's retirement plans breached their fiduciary duties in part because their plan offered the CREF Stock Account and the TIAA Real Estate Account. *See Sweda*, 923 F.3d at 331. A year before, a Court within the First Circuit—the District of Rhode Island—similarly concluded that participants in Brown University's retirement plan stated a claim based on the underperformance and costly nature of both the CREF Stock Account and the TIAA Real Estate Account. *Short v. Brown Univ.*, 320 F. Supp. 3d 363, 372 (D.R.I. 2018). The CREF Stock Account has only continued to underperform lower-cost funds in the same category.

95.     As the plaintiffs in the litigation involving Brown University pointed out, the CREF Stock Account underperformed in comparison to the following actively managed, large-cap funds with similar underlying asset allocations: The Vanguard Diversified Equity Fund (Investor Class) (VDEQX), the Vanguard PRIMECAP Fund (Admiral) (VPMAX), and the

---

[20] The total was $59,014,661 in 2022.

Vanguard Capital Opportunity Fund (Admiral) (VHCAX)." Compl. ¶ 70, *Short v. Brown Univ.*, No. 17-cv-00318-M-PAS (D.R.I. July 6, 2017). Unsurprisingly, the CREF Stock Account has continued to underperform, in virtually every comparison, over 1-, 3- , and 5-year periods,[21] in some cases, underperforming by a third:

| | 5-Year Performance | 3-Year Performance | 1-Year Performance |
|---|---|---|---|
| *CREF Stock Account (In Plan)* | 11.67% | 7.55% | 26.16% |
| **Vanguard Diversified Equity** | 14.77% | 8.15% | 32.12% |
| **Vanguard PRIMECAP** | 13.51% | 9.62% | 22.81% |
| **Vanguard Capital Opp.** | 13.27% | 7.34% | 24.45% |

96.     As detailed in the chart above, every single one of the comparator funds the Brown University Plan participants identified outperformed the CREF Stock Account over the past five years, (and the TIAA option has only essentially matched one alternative over the three-year period and slightly overperformed that and another in the shorter one-year period), carrying forward into the Class Period the underperformance flagged well before. And the CREF Stock account had been underperforming for years even before the *Brown* plaintiffs filed. Prudent fiduciaries would have investigated and sought out better performing, lower-cost alternatives to the CREF Stock Account either from among those *specifically* identified in public litigation or from the myriad alternatives available in the marketplace. That Defendants failed to do so shows they failed to implement a prudent process for monitoring the Plans' investment options.

97.     The options listed in the above chart are simply examples of the superior options available in the marketplace.

---

[21] Performance information for each option is from the Financial Times website, www.ft.com, as of November 30, 2024. While defendants in other cases have argued that two of the Vanguard options are closed to new investors, a Session of the District of Massachusetts has rejected such an argument because one remains available. *See Sellers*, 647 F. Supp. 3d at 30. In any case, the comparators show that the very same issues have persisted for well over a decade, not necessarily that Defendants should have offered any or all of these specific options.

98.     Not only have court opinions, of which Defendants should have made themselves aware, identified flaws with the CREF Stock Account, but fiduciaries of other plans have acted with respect to that option. In *Sellers*, even the Defendants' expert acknowledged that dozens of university plans' fiduciaries had frozen the CREF Stock Account. *See* Redacted Expert Report of Russell Wermers at 63, *Sellers v. Trustees of Boston College*, No. 22-cv-10912-WGY (D. Mass.) (D.E. 62-13) (listing 51 college and university plan sponsors with at least $1 billion in assets that had the CREF Stock Account at some point between 2015 and 2021 and noting that 20 appear to have frozen the option to new investments).

99.     The CREF Stock Account's years-long underperformance stems from a structural problem with that fund's investment design. While its name implies that the fund generically invests in "stocks," and a casual investor might expect it to roughly track the S&P 500 or the Dow Jones, the CREF Stock Account is overly concentrated in non-U.S. investments. The fund's managers have invested nearly a third in international investments. This concentration appears to be a major factor in dragging down the option's performance. *See* Opening and Rebuttal Expert Reports of Samuel Halpern, *Sellers v. Trustees of Boston College*, No. 22-cv-10912-WGY (D. Mass.) (D.E. 67-1, 67-2).

100.     Given the CREF Stock Account's clear and continuing underperformance, and given the substantial red flags associated with TIAA in general, the Plans' fiduciaries should have replaced it during the Class Period.

101.     Defendants' failure to take timely action had a profound impact on Plan participants. The CREF Stock Account is the second-largest investment in the combined Plans, after only the TIAA Traditional Annuity. *See supra* ¶¶ 91. Nearly a sixth of the Plans' total assets are invested in the CREF Stock Account. If any investment option merited close scrutiny, this was it.

102.     The TIAA Real Estate Account likewise has been the subject of court attention as an underperforming investment and media reports, too, show issues with that option. Indeed, TIAA's most recent controversy centers on pushing investors into the TIAA Real Estate

Account, which returns less but earns TIAA more. As NBC News reported, "[t]he problem for clients arises when TIAA products promoted by its sales representatives or its advice tool cost more than its competitors' or perform poorly by comparison. An example is a TIAA real estate product the advice tool funnels clients to — it has significantly underperformed an index of real estate investment trusts in six of the past 10 years and is down 4.6% in 2024 while the index is up 4.2%." Morgenson, *supra* n.13.

103.    As the report noted, a plan participant who invested $15,000 in the Real Estate Fund and added $100 per month would have generated about $60,000 in the past 15 years, but if she had done the same with a Cohen & Steers alternative (not specified in the article), she would have $151,000, or a balance two-and-a-half times as large available for retirement. A comparison of the TIAA Real Estate Account's returns with one Cohen & Steers option, the Real Estate Fund Class R (CIRRX) and with the PIMCO Real Estate Return Strategy Fund Institutional Class (PRRSX)[22] bears out this analysis:

|  | 5-Year Performance | 3-Year Performance | 1-Year Performance |
|---|---|---|---|
| ***TIAA Real Estate (In Plan)*** | 1.03% | -3.02% | -5.43% |
| **Cohen & Steers Real Estate** | 6.06% | 1.68% | 24.52% |
| **PIMCO Real Estate Return** | 5.93% | -0.25% | 25.05% |

104.    Similar to the CREF Stock Account, the TIAA Real Estate Account drastically underperforms both alternatives over the longest, most probative period; indeed it underperforms for *all* periods. And like the CREF Stock Account, this performance (and the option's high cost) carry forward issues identified in the Brown University litigation and other cases.

105.    Also as with the CREF Stock Account, the TIAA Real Estate Account's persistent underperformance is due to structural factors. Unlike other options that provide retirement plan

---

[22] Data is as of November 30, 2024. Plaintiffs' expert in the *Sellers* case, who worked for the Department of Labor and had decades of experience advising fiduciaries, analyzed the Real Estate Account at length and discussed the PIMCO Fund as one possible alternative. *See* Report, *supra* ¶ 99 at 25.

participants with exposure to the real estate industry through investments in real estate companies or similar strategies, the Real Estate Account directly holds illiquid real estate investments. As a result, the fund's managers must hold substantial cash reserves to ensure sufficient liquidity to pay benefits. This "cash drag" negatively affects performance. *See* Report, *supra* ¶ 99 at 21-23.

106.    Also as with the CREF Stock Account, the TIAA Real Estate Account has been flagged in prior litigation of which Defendants should have been aware. *See, e.g.*, *Short*, 320 F. Supp. 3d at 372.

107.    In contrast to the CREF Stock Account, however, Defendants finally did take action after years of underperformance and nearly a decade after courts' acknowledging issues with the Real Estate Account should have spurred action. Participant disclosures state that the Real Estate Account was frozen, apparently in 2023. (The 2022 SPD lists only two options as frozen to new investments, while the 2024 Investment Policy Statement lists those and the Real Estate Account). Defendants' failure to act within a reasonable time needlessly exposed participants to an imprudent investment for years.[23]

**2. Defendants Have Also Failed To Address Overly Costly Investment Options Within a Reasonable Time.**

108.    The Plans have also included investment options with unreasonably high expense ratios. For example, the TIAA Real Estate Account has been included throughout the Class Period. And as shown above, the Real Estate account is the 9th largest holding in the combined Plans (down from the 5th largest in 2022). *See supra* ¶ 91. Participants invested in the Real Estate Account appear to pay a 0.87% expense ratio for the privilege of investing in it, according

---

[23] *Cf. Hughes*, 595 U.S. at 176 ("If the fiduciaries fail to remove an imprudent investment from the plan within a *reasonable* time, they breach their duty.") (emphasis added); *Tracey*, 2017 WL 4478239, at *2-3 (denying motion to dismiss despite Defendants' belated changes to entire plan investment lineup).

to the fee disclosure.[24] And as courts have noted in other cases involving the Real Estate Account, *see infra* ¶ 79, the account is structured in a way that inevitably leads to higher expenses. The result is that, while typical real estate funds available to retirement plan participants average expense ratios of 0.59% to 0.64%, the Plans' participants are paying roughly a third more.

109.    As with recordkeeping expenses, plan fiduciaries should evaluate investment fees by obtaining detailed pricing information and comparing existing investment options in the relevant Plan to potential alternatives. Again, larger plans generally qualify for lower fees.

110.    Even aside from the Plans' TIAA offerings, both include investment options with unreasonably high expense ratios. For example, the American Funds EuroPacific Growth Fund has been included throughout the class period and holds the sixth-highest level of participant assets (fourth-highest, behind the CREF Stock and TIAA Real Estate funds, when not counting the TIAA Traditional Annuity investments). Participants invested in the EuroPacific Growth Fund pay a 0.47% expense ratio for the privilege of investing in it. Comparable funds charge a lower expense ratio—the DFA International Large Cap Growth Portfolio (DILRX), with a 0.28% expense ratio, and the Vanguard International Growth Fund (VWILX), with a 0.31% expense ratio. The EuroPacific Fund's much higher fees were unjustified, as it underperformed both the DFA and Vanguard options.

111.    Taking account both fees and performance, either the DFA or Vanguard options would yield a much higher amount available for retirement, according to fee and performance data available from FINRA.[25] According to FINRA's website, the 10-year cost for an investment in these options is dramatically higher for the EuroPacific Fund to which Defendants have

---

[24] By contrast, participants in Northeastern University's plan, which has fewer participants, paid 0.77% and a Session of the District of Massachusetts denied a motion to dismiss a suit including claims that this amount was unreasonably excessive. *Brookins*, 2024 WL 1659507, at *4.

[25] FINRA, or the Financial Industry Regulatory Authority, is a government-authorized self-regulatory organization that oversees U.S. broker-dealers. *See* https://www.finra.org/about.

limited the Plans' participants. For a hypothetical investment of $25,000, the cost over a decade is approximately 50% higher than both potential comparators:

| Fund | 10-Year Cost for $25,000 investment[26] |
|------|------------------------------------------|
| *American Funds EuroPacific Growth (In Plan)* | $1,476.71 |
| **DFA International Large Cap Growth** | $888.77 |
| **Vanguard International Growth** | $982.40 |

112.    As FINRA also reports, all of these funds are in the same Morningstar category and have the same Morningstar rating.

113.    Viewed differently, a comparison of the closing prices for each of the three funds shows that an investor who made the same hypothetical, $25,000 investment just before the start of the class period would have an investment worth almost twenty percent more after six years if she had access to an alternative investment, even without accounting for additional contributions or similar factors:

| Fund | Current Value of Initial $25,000 in Shares Purchased 11/30/2018[27] |
|------|---------------------------------------------------------------------|
| *American Funds EuroPacific Growth (In Plan)* | $29,787.23 |
| **DFA International Large Cap Growth** | $34,852.94 |
| **Vanguard International Growth** | $32,131.71 |

114.    The difference in closing prices is even more dramatic when viewed over a ten-year window. An investor who purchased $25,000 worth of shares in the Vanguard fund would have earned nearly four times as much for her retirement:

---

[26] Data from FINRA Fee Comparison website as of November 30, 2024.
[27] Based on closing prices as reported on Financial Times website for 11/30/2018 and 11/30/2024.

| Fund | Current Value of Initial $25,000 in Shares Purchased 11/30/2014[28] |
|---|---|
| *American Funds EuroPacific Growth (In Plan)* | $29,190.06 |
| **DFA International Large Cap Growth** | $35,148.31 |
| **Vanguard International Growth** | $39,204.62 |

115.    Plaintiff cites these potential alternatives as examples of funds available in the marketplace. As with the market for recordkeeping, the universe of mutual funds available is large and there are multiple options to choose from for each investment category (e.g., mid-cap value, large-cap growth, etc.). The fact that there are several superior options available for the most significant options in the Plan is evidence that Defendants did not employ a prudent process in administering the Plan.

116.    As with recordkeeping expenses, plan fiduciaries should evaluate investment fees by obtaining detailed pricing information and regularly comparing existing investment options in the relevant Plan to potential alternatives. Again, larger plans generally qualify for lower fees. The effect is pronounced compared to recordkeeping fees, because mutual funds offer lower-fee share classes to investors that satisfy a threshold amount invested. In addition, the same investments may be available through lower-cost vehicles such as Separate Accounts.

117.    Had Defendants prudently monitored the investments within the Plan, Defendants would have taken action as to the CREF Stock Account and the American Funds EuroPacific Growth Fund and other funds, and would have acted far earlier as to the TIAA Real Estate Account, in favor of superior funds featuring comparable investment objectives, superior performance, and lower fees. Such actions could have taken the form of removing, freezing, replacing, or renegotiating the terms of these options.

---

[28] Based on closing prices as reported on Financial Times website for 11/30/2014 and 11/30/2024.

## CLASS ACTION ALLEGATIONS

118.    Plaintiff brings causes of action as a class action on behalf of himself and all

others similarly situated. ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2) allows participants to

bring actions on behalf of a plan. Plaintiff seeks certification pursuant to that provision and

pursuant to Federal Rule of Civil Procedure 23(a) and (b). The putative Class that Plaintiff seeks

to represent is defined as follows:

> All persons, except Defendants and their immediate family members, who were
> participants in, or beneficiaries of the Draper Retirement Plan and/or the Draper SRAP, at
> any time between December 17, 2018 through the date of judgment (the "Class
> Period").[29]

119.    <u>Numerosity</u>: The members of the Putative Class are so numerous that joinder of

all members is impractical. As of December 31, 2023, the Retirement Plan had 4,124

"participants with account balances as of the end of the plan year" Retirement Plan Form 5500 at

2, while the SRAP had 2,338 such participants, SRAP Form 5500 at 2. To require individual

actions would prejudice putative Class Members and Defendants. The identities of the putative

Class Members, and the details of their retirement plan accounts, will be determined from

Defendants' records.

120.    <u>Typicality</u>: Plaintiff's claims are typical of those of other members of the Putative

Class. Plaintiff participated in the Retirement Plan and has suffered injuries as a result of

Defendants' mismanagement, like other Class members, which has equally affected members of

both the Retirement Plan and the Draper SRAP. Defendants treated Plaintiff and other Class

members consistently and managed the Plans jointly and uniformly as to all Participants.

Plaintiff's claims arise out of the same conduct and misconduct by Defendants, as alleged herein,

that form the basis of Class members' claims. Defendants' wrongful conduct has affected all

---

[29] Plaintiff reserves the right to propose different or additional classes or subclasses in
their motion for class certification or subsequent pleadings.

members of the Class similarly. Plaintiff's claims are thereby representative of and co-extensive with the claims of the Class.

121.    <u>Commonality</u>: There are questions of law and fact common to Plaintiff and putative Class Members that predominate over any questions affecting only individual members of the putative Class. These common questions of law and fact include, but are not limited to:

    a)  Whether Defendants are and/or were fiduciaries of the Plans;

    b)  Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

    c)  Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plans were being managed in compliance with ERISA;

    d)  The proper form of equitable and injunctive relief; and

    e)  The proper measure of monetary relief.

122.    <u>Adequacy of Representation</u>: Plaintiff has no conflicts of interest with other Class Members, will fairly and adequately represent the Class, and will prosecute the case vigorously on behalf of the Class. Counsel representing Plaintiff are competent and experienced in litigating complex cases and large class actions, including ERISA and other employment law cases.

123.    <u>Superiority of Class Action</u>:  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Putative Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests. An award of equitable relief, such as removal of fiduciaries, would apply to all participants in the Plan and would thus be dispositive of their interests.

124.    In the alternative, certification is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

125.    Finally, certification is warranted under Rule 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' misconduct applied uniformly to all Class members, who individually do not have an interest in pursuing separate actions. The amount of each individual's recovery is relatively small compared to the burden of individual prosecution. Certification will also obviate the need for duplicative litigation that might render inconsistent judgment, and management of this action as a class action will not present likely difficulties.

126.    If each individual Member of the Putative Class were required to file an individual lawsuit, Defendants would necessarily gain an unfair advantage because Defendant would be able to exploit and overwhelm the limited resources of each Class Member with Defendants' vastly superior financial legal resources.

127.    Requiring each individual Member of the Putative Class to pursue an individual remedy would also discourage the assertion of lawful claims by those Class Members, particularly by those still employed by Draper, who would be disinclined to pursue these claims against Defendants because of an appreciable and justifiable fear of retaliation and permanent damage to their careers and well-being.

## FIRST CAUSE OF ACTION

**Breach of Fiduciary Duty of Prudence in Violation of ERISA (29 U.S.C. § 1104(a)(1)(B))**

128.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

129.    As alleged above, Defendants are fiduciaries with respect to the Plans and are subject to ERISA's fiduciary duties.

130.    ERISA Section 404, 29 U.S.C. § 1104, imposes fiduciary duties of prudence upon the Defendants in connection with the administration of the Plans, the selection and monitoring of Plan investments, and the monitoring of service providers to the Plans.

131.    Defendants' fiduciary responsibilities include managing the assets of the Plans for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with appropriate care, skill, diligence, and prudence. Defendants are also required to act in accordance with the documents and instruments governing the Plan insofar as they are consistent with ERISA. Finally, Defendants are obligated to ensure that the Plans' fees are reasonable, to select and retain prudent investment options, evaluate and monitor the Plans' investments on an ongoing basis and eliminate imprudent ones, and take all necessary steps to ensure that the Plans' assets are invested prudently. This duty includes "a continuing duty . . . to monitor investments and remove imprudent ones[.]" *Hughes*, 595 U.S. at 175; *Tibble*, 575 U.S. at 529.

132.    As detailed above, Defendants failed to prudently and objectively monitor the Plans' investments to ensure that each of the investments was and remained appropriate for the Plans. Defendants failed to remove those investments that were no longer appropriate within a reasonable time. Defendants retained imprudent funds as plan investments despite the availability of superior alternative investments that would have cost plan participants significantly less and performed significantly better. Defendants failed to remove underperforming and costly funds, and to investigate alternatives to TIAA as recordkeeper.

133.    Each of the actions and omissions described in Paragraph 132 above and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

134.    Defendants' conduct likely also constitutes a breach of their duty to act in accordance with the documents and instruments governing the plan, namely the Investment Policy Statement, in violation of ERISA Section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

135.    The Plans and their participants suffered millions of dollars in losses as a consequence of Defendants' fiduciary breaches.

136.    Under ERISA Sections 409 and 502, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to make good to the Plans all losses resulting from the aforementioned fiduciary breaches, to restore to the Plans any profits Defendants made through use of Plan assets, and to restore to the Plans any profits resulting from their breaches of fiduciary duties.

137.    Each Defendant knowingly participated in each breach of the other Defendants, with knowledge that such acts were a breach, and enabled other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties. Each Defendant knew of the other Defendants' breaches and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Under ERISA Section 405, 29 U.S.C. § 1105(a), each Defendant is therefore also liable for the losses caused by the breaches of their co-fiduciaries.

138.    Wherefore, Plaintiff and Members of the putative Class request relief as hereinafter provided.

## SECOND CAUSE OF ACTION

## Prohibited Transactions in Violation of ERISA (29 U.S.C. § 1106(a)(1)(C))

139.    Plaintiff realleges and incorporates by reference all allegations in all proceeding paragraphs.

140.    As alleged above, Defendants are fiduciaries with respect to the Plans and are subject to ERISA's fiduciary duties.

141.    ERISA Section 406, 29 U.S.C. § 1106, prohibits certain transactions deemed 'likely to injure" plans such as the Retirement Plan and the SRAP. *Brotherston*, 907 F.3d at 25. One such prohibited transaction provides that fiduciaries, such as Defendants, may not "cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or

indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C).

142.    Pursuant to Section 406(a)(1)(C) and its exemptions, fiduciaries must consider all sources of compensation that a service provider receives and ensure that such compensation is reasonable; if not, the transaction constitutes a furnishing of services prohibited by ERISA. *See Bugielski*, 76 F.4th at 910-11.

143.    As detailed above, Defendants failed to investigate *all* sources of compensation that TIAA received—including direct fees for recordkeeping, revenue sharing from non-proprietary funds, income from proprietary funds, and ancillary revenue—and to ensure that such compensation was reasonable. Defendants' failure violates Section 406.

144.    Each of the actions and omissions described in Paragraph 143 above and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

145.    While Section 406 imposes a per se ban and does not require a showing of harm to prove a violation, *see Bugielski*, 76 F.4th at 900, Defendants' prohibited transactions resulted in the Plans and their participants suffering millions of dollars in losses.

146.    Under ERISA Sections 409 and 502, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to make good to the Plans all losses resulting from the aforementioned prohibited transactions. *See Harris Trust & Sav. Bank*, 530 U.S. at 241.

147.    Wherefore, Plaintiff and Members of the putative Class request relief as hereinafter provided.

## THIRD CAUSE OF ACTION

**Failure to Monitor Fiduciaries**

148.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

149.    Defendant Draper is a fiduciary of the Plans with responsibilities relating to the selection and monitoring of the Plans' investment options.

150.    Draper is responsible for appointing and removing administrators and individuals charged with administration and oversight of the Plans. Draper therefore has a fiduciary responsibility to monitor the performance of all other fiduciaries.

151.    ERISA requires monitoring fiduciaries to ensure that the fiduciaries they monitor in turn satisfy their fiduciary obligations. These obligations include those with respect to investment selections, monitoring of service providers, and compliance with plan documents. Monitoring fiduciaries are required to act promptly to protect plans, participants, and beneficiaries when monitored fiduciaries breach their own obligations.

152.    Draper breached its fiduciary monitoring duties in numerous ways, including:

   a)    failing to monitor and evaluate the performance of individuals appointed to monitor and administer the Plans and failing to have a system in place for doing so. Draper did nothing as the Plans suffered significant losses as a result of imprudent actions and omissions;

   b)    failing to monitor the processes by which those responsible selected and monitored Plan investments. The monitored fiduciaries actions and inactions would have alerted a prudent fiduciary to the breaches of fiduciary duties outlined above; and

   c)    failing to remove administrators whose performance was inadequate as demonstrated by their retaining imprudent, excessively costly, and poorly performing investments within the Plans and failing properly to monitor

recordkeeping fees to the detriment of the Plans and plan participants'
retirement savings.

153.    Due to these foregoing breaches of the duty to monitor, the Plans suffered millions
of dollars per year in losses due to excessive fees and investment underperformance.

154.    ERISA Sections 409 and 502, 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3),
render Draper liable to restore to the Plans all losses suffered as a result of the fiduciary breaches
that resulted from its failure to properly monitor its appointed fiduciaries.

155.    Wherefore, Plaintiff and putative Class Members request relief as hereinafter
provided.

## **PRAYER**

156.    For these reasons, Plaintiff and Class Members respectfully request that judgment
be entered in their favor awarding the following relief:

a)    A determination that this action may proceed as a class action under Rule
     23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil
     Procedure;

b)    Designation of Plaintiff as Class Representative and designation of Plaintiff's
     counsel as Class Counsel;

c)    A Declaration that the Defendants have breached their fiduciary duties under
     ERISA;

d)    An Order compelling the Defendants to personally make good to the Plan all
     losses to the Plans incurred as a result of Defendants' breaches of their fiduciary
     duties described above and to restore the Plans and their participants to the
     position they would have been in but for this unlawful conduct;

e)    An order requiring Defendants to disgorge all profits received from, or in
     respect of, the Plan, and/or equitable relief pursuant to ERISA Section
     502(a)(3), 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits,
     imposition of a constructive trust, or a surcharge against Defendants as

necessary to effectuate said relief, and to prevent Defendants' unjust enrichment;

f)  Restoration of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

g)  An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

h)  Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plans, transfer of Plan assets out of imprudent investments into prudent alternatives, and removal of fiduciaries deemed to have breached their fiduciary duties;

i)  An award of pre-judgment interest;

j)  An award of attorneys' fees and costs pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g) and the common fund doctrine; and

k)  An award of such other and further relief as the Court deems equitable and just.


Dated: December 17, 2024                    Respectfully submitted,


                                            /s/*Osvaldo Vazquez*
                                            Stephen Churchill, BBO #564158
                                            Osvaldo Vazquez, BBO #711808
                                            FAIR WORK, P.C.
                                            192 South Street, Suite 450
                                            Boston, MA 02111
                                            Tel. (617) 607-3260
                                            Fax (617) 488-2261
                                            steve@fairworklaw.com
                                            oz@fairworklaw.com

                                            *Attorneys for Plaintiff and Class Members*